# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1301

_____

Jose Juan Macias Soto,       *
     *
     Plaintiff - Appellant,      *
     *    Appeal from the United States
     v.      *    District Court for the
     *    District of Minnesota.
Core-Mark International, Inc.,      *
     *
     Defendant - Appellee.      *

_____

Submitted: October 5, 2007
Filed: April 1, 2008

_____

Before WOLLMAN, BYE, and SHEPHERD, Circuit Judges.

_____

BYE, Circuit Judge.

Jose Juan Macias Soto appeals the district court's[1] order, granting summary judgment in favor of Core-Mark International, Inc. (Core-Mark), on his claim for retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. §§ 2000e-2000e-5, and in violation of the Minnesota Human Rights Act (MHRA), Minn. Stat. § 363A.03. We affirm.

_____

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

# I

Mr. Soto worked as a driver for Core-Mark from July 2002 until he was terminated on December 30, 2003. In June 2003, he sustained a back injury while on the job. As a result of the injury, he was temporarily reassigned from his driver position to light duty. His doctor restricted his work activities to certain lift/carry maximums, push/pull maximums, twisting/turning at waist limitations, and bending at waist limitations. Additionally, the doctor ordered him to be allowed to alter his posture as needed, sit/stand as needed, walk frequently, and perform back stretching exercises upon the onset of back pain or after performing tasks which required physical labor. His supervisors and managers, including the Human Resources Manager, Ms. Toni Gonzalez, knew about his injury and his work restrictions.

In November 2003, Mr. Soto spoke with his supervisors because he believed he was being discriminated against based on his national origin. He claimed only white employees were allowed to wear jackets over their uniforms and use their cell phones. Thereafter, Core-Mark posted a memo reiterating the use of cell phones and beepers was prohibited.[2] About one month later, he again told his supervisor white employees were wearing jackets over their uniforms and again asked for permission to wear a jacket over his uniform. The supervisor explained to him no workers were allowed to wear jackets over their uniforms.

Later that same day, Mr. Soto asked to leave work early because of experiencing chest pain. His supervisor told him if he left work early his employment would be terminated. He stayed until his shift was over, then went to an urgent care clinic where a doctor diagnosed him with pneumonia and ordered he stay home from work for about ten days. He returned to work in mid-December. On his first day

---

[2] The parties dispute whether, nonetheless, Core-Mark continued to allow white drivers to use cell phones and wear jackets over their uniforms.

back, he wore a jacket over his uniform. When his supervisor told him he was not allowed to wear the jacket, he responded the white workers were allowed to wear jackets over their uniforms and this constituted discrimination.

On the same day, Mr. Soto received a letter concerning his "continued unacceptable conduct and behavior." Joint Appendix ("J.A.") at 79. The letter informed him he could no longer contact Ms. Gonzalez about previously resolved issues. Moreover, it stated if he wanted to meet with Ms. Gonzalez he would have to contact a manager ahead of time to schedule an appointment. The letter further advised if he chose to continue conducting himself in such a "disruptive manner" he would be "at risk for disciplinary action up to and including termination of employment." Id. Soon after receiving the letter, he began the process of filing a discrimination charge with the Minnesota Department of Human Rights.

On December 26, 2003, Mr. Soto was assigned to clean an office. The assignment required him to bend over to peel stickers off of the floor. The bending caused him back pain so he sat down to rest and stretch his back. He leaned forward, put his head on his forearms, and pushed his back forward and up, keeping his eyes open the entire time.

One of Mr. Soto's coworkers observing him and, believing he was sleeping at his workstation, reported the incident to Mr. Richard Laliberte, a Core-Mark manager. Mr. Laliberte went over to his workstation to observe for himself. He had his head down and his eyes closed. Mr. Laliberte stood over him for several minutes and he never moved. According to Mr. Laliberte, at this point, he woke him up and sent him home for the day. He maintains he was awake, his eyes were open, and his head was facing towards the ground. According to him, he did not realize Mr. Laliberte was observing him until he saw Mr. Laliberte's shoes, at which time he explained to Mr. Laliberte he was stretching, not sleeping.

The same day, Mr. Laliberte sent an email to Ms. Gonzalez (and copied Mr. Hunter) explaining the incident. The email provided the following summary:

> I went to look at [Mr. Soto] and he had his head down and so I walked up to him and stood right next to him. I waited by him for about 3 minutes and I could tell that he was sleeping. I moved and he woke up. I asked him why he was sleeping and he said that he was resting his back and that he was not sleeping. I told him that I was standing right by him for 3 min or longer and he never moved and that sleeping on the job would not and could not be tolerated. I told him that he would be written up for this and that I had better not catch him doing it again or I would terminate him. All the time that I was talking to him he denied that he was sleeping.

J.A. at 69. Mr. Laliberte subsequently filed a written report of the incident.

On December 30, 2003, Ms. Gonzalez conducted an investigation of the December 26, 2003, incident. She obtained written statements from two witnesses: Mr. Fortin, who had reported the incident to Mr. Laliberte, and Ms. Taylor. In their statements, both witnesses indicated Mr. Soto appeared to have been sleeping. Ms. Gonzalez spoke with Mr. Laliberte, who reiterated his opinion as to Mr. Soto having been asleep. She then discussed the matter with the director of operations, Jim Hunter, and the director of corporate human resources. They determined Mr. Soto should be terminated. It does not appear from the record anyone from Core-Mark interviewed or spoke with him directly regarding the incident.

On December 30, 2003, Mr. Soto was terminated for sleeping on the job.[3] A few weeks later, Ms. Gonzalez sent him a written termination letter. The letter stated

---

[3]In the proceedings below, Mr. Soto claimed during the meeting Ms. Gonzalez laughed at him and Mr. Hunter told him they knew he was going to file a discrimination report.

-4-

he was terminated for sleeping on the job and references the December 26, 2003, incident.

Mr. Soto filed a claim for discriminatory discharge against Core-Mark with the Equal Employment Opportunity Commission (EEOC).  Following an investigation, the EEOC concluded no probable cause existed to believe Core-Mark had engaged in an unfair discriminatory practice and, therefore, it dismissed Mr. Soto's claim.

In September 2005, following the EEOC's dismissal, Mr. Soto filed a lawsuit against Core-Mark in the United States District Court, District of Minnesota, asserting claims for national origin discrimination and retaliation in violation of Title VII and the MHRA.  Core-Mark moved for summary judgment, arguing the plaintiff could not, as a matter of law, establish Core-Mark's stated reason for his termination–that he was sleeping on the job–was a pretext for discrimination or retaliation.  The district court agreed with Core-Mark and, in an order dated January 3, 2007, granted Core-Mark's motion for summary judgment.

Mr. Soto appeals the district court's order granting Core-Mark summary judgment on his claim of retaliation in violation of Title VII and the MHRA.

II

This Court reviews a district court's grant of summary judgment de novo, drawing all reasonable inferences in favor of the non-moving party.  Hitt v. Harsco Corp., 356 F.3d 920, 923-24 (8th Cir. 2004).  We use the three-part, burden-shifting analysis set forth in Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), to review claims of retaliatory discrimination where the plaintiff fails to produce direct evidence of discrimination.  See Scott v. County of Ramsey, 180 F.3d 913, 917 (8th Cir. 1999).

Initially, the plaintiff has the burden of establishing a prima facie case of retaliation. To establish this, the plaintiff must show he engaged in a protected activity, the defendant took adverse action against him, and there is a connection between the two. See Scott, 180 F.3d at 917 (citing Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997)). If the plaintiff makes a prima facie showing of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse action, in this case Mr. Soto's termination. Id. (citing Ryther v. KARE 11, 108 F.3d 832, 836 (8th Cir. 1997) (en banc)). If the defendant advances a legitimate reason for the termination, the plaintiff bears the burden of demonstrating the defendant's stated reason is a pretext for retaliation. Burdine, 450 U.S. at 253; see also Cronquist v. City of Minneapolis, 237 F.3d 920, 926 (8th Cir. 2001); Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir . 1980).

In order to survive summary judgment at this stage, the plaintiff must establish there is a factual dispute whether the defendant's proffered reason is pretextual and whether retaliation was a determinative factor in the defendant's termination. Cronquist, 237 F.3d at 926. Throughout this analysis, the ultimate burden of persuasion remains with the plaintiff to show the termination was motivated by intentional retaliation. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993).

III

Mr. Soto challenges the district court's determination he failed to raise a factual dispute as to the pretextual nature of Core-Mark's proffered reason for termination and failed to create a reasonable inference it was motivated by retaliation. Mr. Soto makes two arguments in support of his appeal. First, he argues, in concluding he failed to produce sufficient evidence of pretext, the district court viewed the disputed evidence in the light most favorable to the employer, the moving party, in direct contravention of well-settled summary judgment principles. Second, he argues, in analyzing

whether a retaliatory motive was a determinative factor in the employer's termination decision, the district court failed to consider the totality of the evidence.

## A. Evidence Of Pretext

Before the district court, Mr. Soto maintained the December 26, 2003, incident was a pretext for retaliation because he was not sleeping on the job; rather, he was stretching and resting his back consistent with his doctor's orders, of which his employer was aware. According to the plaintiff, the Court improperly chose to adopt the employer's version of the December 26, 2003, incident, rather than his, in direct violation of basic principles of summary judgment.

Mr. Soto misunderstands which facts are material to the district court's determination of the last prong of the Burdine analysis. Even if he presented sufficient evidence to show he was not actually sleeping during the December 26, 2003, incident, such does not equate to sufficient evidence of pretext. In determining whether a plaintiff has produced sufficient evidence of pretext, the key question is not whether the stated basis for termination actually occurred, but whether the defendant believed it to have occurred. See Hitt, 356 F.3d at 924; Scroggins v. Univ. of Minn., 221 F.3d 1042, 1045 (8th Cir. 2000) (holding the "relevant inquiry" in retaliation case is whether the employer believed the employee was guilty of the conduct justifying discharge) (internal quotation omitted). In this case, the evidence that he claims the district court disregarded–his deposition testimony about his stretching his back, not sleeping–does not create a factual dispute about the employer's good faith belief he was sleeping on the job nor does it in any other way call into question the employer's stated reason for terminating him.

Moreover, notwithstanding Mr. Soto's contentions, the district court did not err in concluding Core-Mark had a good faith belief he was sleeping on the job. The evidence in the record shows Core-Mark's determination was based on the statements

of two witnesses and information provided by Mr. Laliberte. Contrary to his suggestions, the witnesses did not state they were unable to determine whether he was asleep; they stated they were reasonably certain, although not positive, he was asleep.

Nor did Mr. Laliberte state Mr. Soto was not asleep. Mr. Laliberte told Ms. Gonzalez he went over to the plaintiff's workstation and stood right next to him; he "waited by him for about 3 minutes and could tell that he was sleeping." J.A. at 69. Moreover, contrary to the plaintiff's assertion, Mr. Laliberte did not state his termination was unwarranted. Rather, Mr. Laliberte warned him if he fell asleep on the job again he would be terminated. In an email to Ms. Gonzalez following the incident, Mr. Laliberte summarized his actions and asked Ms. Gonzalez to let him know if he needed to take any additional action. The fact Mr. Laliberte did not fire the plaintiff on the spot does not show Mr. Laliberte believed the termination was unwarranted.

The record shows Core-Mark had a good faith belief, based on reasonable and credible evidence, Mr. Soto was sleeping on the job. And, his appeal fails to provide any reason to question the district court's finding on this matter.

## B. Retaliatory Motive

Mr. Soto next argues it was error for the district court to conclude, as a matter of law and based on the totality of the evidence, no reasonable juror could find retaliatory motive was a determinative factor in employer's decision to terminate the employee. Specifically, he sets forth several items of evidence he believes the district court erroneously disregarded, including: (1) the December 12, 2003, letter; (2) statements Mr. Hunter made at the December 12, 2003, meeting; and (3) examples of white employees being allowed to wear coats over their uniforms and use cell phones.

According to Mr. Soto, the December 12, 2003, letter from Ms. Gonzalez and Mr. Hunter "prohibited [Mr. Soto from exercising his] right to oppose discriminatory practices (as guaranteed by Title VII)" and "provides direct evidence of Mr. Hunter's and Ms. Gonzalez's mindset and intention to prevent Mr. Soto from continuing to oppose discriminatory practices." J.A. at 33. He does, however, misrepresent the contents of the letter. The letter informed him he was no longer allowed to contact Ms. Gonzalez directly. Instead, if he wanted to speak with Ms. Gonzalez he first had to make an appointment through a manager. The letter did not prohibit Mr. Soto from opposing discriminatory practices and in no way evidenced a discriminatory intent on the part of either Mr. Hunter or Ms. Gonzalez.

With respect to the December 12, 2003, meeting, Mr. Soto claims after he expressed his opinion he was being discriminated against because of his national origin, Mr. Hunter stated: "Get out of my office." Appellant's Br. at 34. Even if Mr. Hunter did order Mr. Soto to "get out of [his] office," this does not demonstrate a retaliatory animus. The record shows he was repeatedly told it was against the rules for employees to wear jackets over their uniforms or use cell phones. Nonetheless, he continued to wear his jacket over his uniform. At most, the evidence shows Mr. Hunter was frustrated with repeatedly having to tell him to follow the rules.

Finally, Mr. Soto points to evidence he argues shows similarly situated white workers received more favorable treatment than he did. However, he fails to put forth evidence showing other white workers who wore their jackets over their uniforms were not reprimanded or showing white workers who repeatedly complained to Ms. Gonzalez directly were not also required to make appointments beforehand. As the district court stated, the plaintiff "attracted attention to his behavior by repeatedly complaining that he observed others engaging in this behavior and repeatedly asking for permission to break the rules." J.A. at 13.

Contrary to Mr. Soto's contentions, the record shows the district court properly concluded no reasonable juror could find retaliatory motive was a determinative factor in the employer's decision to terminate him.

## IV

Accordingly, we affirm the district court's order, granting summary judgment in favor of Core-Mark on Mr. Soto's claim of retaliation in violation of Title VII and the MHRA.

_____